GEORGE B. LEWIS *vs.* MARCIA A. HINMAN AND
ANOTHER.

New Haven Co., June T., 1887. PARK, C. J., CARPENTER, PARDEE,
LOOMIS and BEARDSLEY, JS.

A second mortgagee may redeem the first mortgage and hold it against
parties subsequent in interest; but subsequent parties cannot, except
under unusual circumstances, redeem the first mortgage and hold it
against the second mortgagee. Equity will regard it as a payment.

The intention that there should be a merger as to part of property re-
deemed raises a presumption of such an intention as to all; and that
presumption must prevail unless there is something in the case to
rebut it.

A third mortgagee paid a first mortgage in ignorance of a second mortgage
on the property, and would not have paid it if he had known of such
second mortgage. Held not enough to prevent a merger where the
actual intent was to pay the first mortgage and have it discharged.

Whether, where a mortgagee puts his mortgage on record several weeks
after its execution, and in the meantime another mortgage of the same
property is made to another party, and put on record, the first mort-
gagee would be chargeable with notice of all that was contained in the
second mortgage: *Quære.* The court inclined to the opinion that he
would.

Where a prior mortgagee has a second mortgage on another piece of land,
but does not know of a subsequent mortgage on the first piece, he may
release his mortgage on the other piece without being chargeable, for
the benefit of the subsequent mortgagee, with the value of that security
upon his mortgage debt.

And where such prior mortgagee holds such a second mortgage on another
piece of land, and the first mortgagee of that piece is about to foreclose
and there is a considerable value in his second mortgage, the subse-
quent mortgagee of the first piece cannot require him to redeem the
other piece, but can himself redeem the prior mortgage on the first
piece, and thus become subrogated to that mortgagee's rights, and
standing on those rights can himself redeem the other piece.

An error made in the record of a deed cannot affect the grantee in
the deed. His title is secure from the time it was left for record, and
cannot be affected by anything that occurs afterwards without his
fault.

And where the record of a mortgage is such as to suggest a probable
mistake in the recording, it puts a party on inquiry and charges him
with notice of what the deed contains.

[Argued June 10th—decided December 16th, 1887.]

SUIT for a foreclosure of a mortgage of real estate; brought to the Superior Court in New Haven County, and heard before *Torrance*, *J.* Facts found and judgment rendered for the plaintiff, and appeal by the defendants. The facts are very complicated, but are sufficiently stated in the opinion to make the points decided by the court easily understood.

*W. L. Bennett* and *A. N. Wheeler*, for the appellants.

On the 3d day of August, 1882, Mrs. Hinman mortgaged four tracts of land, which are called upon the plan *B*, *C*, *D*, and *E*, to the other defendant, Wheeler, to secure her note for $2,500, of which $2,300 was previously loaned and the balance on that day. This mortgage was recorded October 17th, 1882. These four tracts were subject to the following mortgages: one to the Naugatuck Savings Bank on lots *B* and *E*, and one to the Middletown Savings Bank on lot *D*. On August 29th, 1882, she mortgaged lot *B*, with eight other tracts of land, to one Bull, to secure a note of $1,600, and this mortgage was recorded on September 1st, 1882, but was erroneously recorded in that lot *B* was bounded on Cedar street 35 feet instead of 65 feet. On March 29th, 1883, Mrs. Hinman conveyed the equity in these lots for a valuable consideration to Mrs. Benham. On June 19th, 1883, Mrs. Benham made an agreement with one Rausch to sell him lots *D* and *E* and to give him a clear and unincumbered title thereto. In order to accomplish this she agreed with the mortgagees thereof to release their mortgages to her upon the following terms: both banks to receive their pay in full and Wheeler to receive $900 and a clear title to lots *B* and *C*. This was done as was supposed by all parties, as neither she, her agent, nor Wheeler, had any knowledge of the Bull mortgage covering lot *B*, and this agreement would not have been made or carried out if they had known it. The note of the bank was delivered up to Mrs. Hinman, with the consent of Mrs. Benham, both of them still being in ignorance of the Bull mortgage.

1. The first question is—did the Naugatuck Savings Bank

mortgage, so far as it covered lot *B*, merge, in the hands of Mrs. Benham, when she paid it and it was conveyed to her June 19th, 1883. We say that it could not, and did not, even if it were possible, for the following reasons:— (1.) Because the legal and equitable estates never coincided in her hands without intermediate estates. Both the Bull and Wheeler mortgages always intervened. 1 Jones on Mortg., § 848, and cases cited—(2.) Because it was not for her interest that it should merge, and would be greatly to her disadvantage if the two estates were not kept distinct in order to protect her against these two subsequent mortgages. Under such circumstances it is presumed, as a matter of law, that no merger takes place. 1 Jones on Mortg., §§ 848, 868–873; *Duffy* v. *McGuiness*, 13 R. Isl., 595; *Grover* v. *Thatcher*, 4 Gray, 526; *N. Eng. Jewelry Co.* v. *Merriam*, 2 Allen, 390; *Bell* v. *Woodward*, 34 N. Hamp., 90; *Stanton* v. *Thompson*, 49 id., 272; *Bacon* v. *Goodnow*, 59 id., 415; *Baldwin* v. *Norton*, 2 Conn., 161; *Lockwood* v. *Sturdevant*, 6 id., 373; *Donalds* v. *Plumb*, 8 id., 447; *Bassett* v. *Mason*, 18 id., 131; *Mallory* v. *Hitchcock*, 29 id., 135; *Goodwin* v. *Keney*, 47 id., 486; *Boardman* v. *Larrabee*, 51 id., 39. —(3.) Because she paid the mortgage and accepted the deed from the bank in ignorance of the true state of the title, under a mistake of fact and through inadvertence. *Stanton* v. *Thompson*, *supra; Rumpp* v. *Gerkens*, 59 Cal., 496.—(4.) Because she never intended it to merge. 1 Jones on Mortg., § 856. As before stated, the state of the title and the interest of Mrs. Benham to keep the mortgage intact, create a presumption of law that no merger took place. Her intention that it should merge is not found as a fact in the record to overcome this presumption, and in the absence of such finding the question will be determined by the interest of the party and the demands of substantial justice. 1 Jones on Mortg., §§ 857–873; *Bank of Waterloo* v. *Elmore*, 52 Iowa, 541; *Woodward* v. *Davis*, 53 id., 694; *Bell* v. *Tenny*, 29 Ohio St., 240. It is true that the deed from the bank to her conveying this mortgage says that it is "paid in full" and that "the object of this deed is to release the secur-

ity therefor." But this is not her deed, nor her language, nor can it be imputed to her. It is appropriate language for the bank to use, which had received its pay in full from her and was therefore under obligation to release to her. She had received no pay in full. She was not releasing the mortgage. On the contrary she was acquiring title to it and got it by this deed. 1 Jones on Mortg., §§ 858, 869; *Green* v. *Currier*, 63 N. Hamp., 563; *Duffy* v. *McGuiness*, 13 R. Isl., 595; *Grover* v. *Thatcher*, 4 Gray, 526. And she afterwards conveyed it in terms to Wheeler, thus showing conclusively that she had never considered it merged and extinguished. She was not the maker of the note; she was under no obligation to pay it; she did not purchase the equity subject to the mortgage; she never agreed to assume or pay the note or discharge the mortgage; neither did she convey the lot *B* with warranty against incumbrances. Not one of the reasons that are held to indicate an implied intent that the mortgage should merge, are found in this case so far. If the interest of the party and substantial justice demand it, and no rights of third persons have intervened, equity will uphold a mortgage against an intervening title or interest, even though the parties had formally undertaken to discharge it and had surrendered the notes. 1 Jones on Mortg., §§ 856, 858, 873; *Duffy* v. *McGuiness*, 13 R. Isl., 595; *Bean* v. *Boothby*, 57 Maine, 295; *Cobb* v. *Dyer*, 69 id., 494; *Kingsley* v. *Davis*, 74 id., 498; *Rigney* v. *Lovejoy*, 13 N. Hamp., 247; *Wilson* v. *Kimball*, 27 id., 300; *Bell* v. *Woodward*, 34 id., 90; *Stanton* v. *Thompson*, 49 id., 272; *Bacon* v. *Goodnow*, 59 id., 415; *Wheeler* v. *Willard*, 44 Vt., 640; *Grover* v. *Thatcher*, 4 Gray, 526; *Crosby* v. *Taylor*, 15 id., 64; *N. Eng. Jewelry Co.* v. *Merriam*, 2 Allen, 390; *Guckian* v. *Riley*, 135 Mass., 71; *Stimpson* v. *Pease*, 53 Iowa, 572; *Baldwin* v. *Norton*, 2 Conn., 161; *Goodwin* v. *Keney*, 47 id., 486. It would be grossly inequitable to hold this mortgage merged. The Bull mortgage was a second mortgage when given; the loan was made for Mr. Bull by the plaintiff and he purchased it February 6th, 1886, with full knowledge of all the facts. It stands just where it did originally, subject to this bank

Lewis v. Hinman.

mortgage. He has done nothing to entitle him to a first lien, but on the contrary much which places him in an inequitable position. It is only through the technicality of getting his deed recorded first, that there is only one instead of two mortgages prior to his. Both Mrs. Benham and Wheeler have done something which entitles them to a first lien on lot *B*. She paid the bank mortgage on the lot out of the proceeds of the equity of lots *D* and *E*, and he released his mortgage on these lots and accepted the equity in lots *B* and *C*, intending to get and supposing that he got a clear title to lots *B* and *C*, and it is expressly found that he would not have done this except for this supposition. To give the plaintiff a first lien is therefore to voluntarily present him with this lot, which is worth about one third his debt, without any consideration on his part, and to deprive those of it who have paid full value for it. The court will avoid such a conclusion if possible. Our claim on this part of the case is, that the plaintiff should be allowed to redeem lot *B* upon paying $487.20 and interest from June 19th, 1883. The whole security, 95 feet at $30, comes to $2,850; the part released, 70 feet at $30, comes to $2,100. As the value of the whole security is to the value of that released, so is the total debt of the bank June 19th, 1883, $1,851.36, to what is now due, $487.20, on the debt. *Andreas* v. *Hubbard*, 50 Conn., 370.

2. There were originally eight tracts of land covered by the Bull mortgage besides lot *B*. Between March 29th, 1883, and March 18th, 1885, Bull or his administrators had released four of these tracts, with equities of redemption of the value of $1,000, and three other tracts were foreclosed by prior mortgagees. All that remained on the 18th day of March, 1885, was lot *B* and the Elm street property. On March 17th, 1885, Wheeler first knew that the Bull mortgage covered lot *B*; and Lewis first knew that Wheeler claimed a first lien on that lot, and the incumbrance upon the remaining tract of land, the Elm street property, was considered, and Lewis was *requested and demanded* by Wheeler to take it to satisfy his mortgage in whole or in part.

He refused to do this, and later, on December 10th, 1885, it was foreclosed, and the title allowed to become absolute in the prior mortgagee. The incumbrances on it were on that day $6,150.13; the value of the property was $8,000—an equity of $1,849.87. His total debt on February 8th, 1887, was $1,963.39, and on March 17th, 1885, was about $1,758 less than the amount of this equity. He released $1,000 worth of equity; he was foreclosed after full knowledge of all the facts in this case of $1,849.87—making $2,849.87, while his total debt on February 8th, 1887, was only $1,963.39. Is he in a position to demand equity? After relying upon the Elm street property for his security, releasing and allowing himself to be foreclosed of everything but that and lot $B$, can he, when he sees a possible chance to claim a first mortgage on lot $B$, allow the Elm street property to pass from him and put his entire mortgage on this 25 feet? He had originally 465 feet for his security. With knowledge of subsequent incumbrances a prior mortgagee cannot release the security to the injury of a subsequent mortgagee, having a lien on portions of his security, without applying the value of the equity released to reduce his debt. 1 Jones on Mortg., §§ 722-728; *Hawke* v. *Snydaker*, 86 Ill., 197. Neither can a prior mortgagee release security without applying the value of it on his debt, when he has knowledge of a conveyance by the mortgagor to third parties. 1 Jones on Mortg., § 722. The plaintiff had this knowledge from the first, for he released to Mrs. Hinman's grantee from March 29th, 1883. He had full actual knowledge on March 17th, 1885, and yet he let the security he had from the first relied on, equal to the value of his debt, slip through his hands without even a desire to retain it; and this in the face of Wheeler insisting and demanding that he should, and claiming a first lien on lot $B$. *Green* v. *Ramage*, 18 Ohio, 428. Wheeler is in a position to demand equity. He received full value for the parts of the security he released. He is subrogated to all the equities of Mrs. Benham. He is a *bonâ fide* purchaser of lots $B$ and $C$ for value, without notice of the Bull mortgage. He had no

lien on the Elm street property and no opportunity or right to redeem it, and it is now gone beyond recall, and he cannot be subrogated to Lewis's security upon the payment of the Bull mortgage. And Mrs. Hinman is insolvent. The equitable power of the court is ample enough to lay hold of the facts of this case, and so mould the decree as to do justice to all parties. *Andreas* v. *Hubbard*, 50 Conn., 351.

*E. H. Rogers*, with whom was *J. G. Clark*, for the appellee.

CARPENTER, J.   On the first day of September, 1882, the defendant, Mrs. Hinman, was the owner of four adjoining lots of land, which are designated in the finding as lots *B*, *C*, *D* and *E*. These lots were subject to mortgages as follows :—Lots *B* and *E* were mortgaged to the Naugatuck Savings Bank, and lot *D* to the Middletown Savings Bank, each being a first incumbrance ; lot *B* was subject to a second mortgage to one Bull, which mortgage is now owned by the plaintiff, and to foreclose which this suit is brought ; all the lots were mortgaged to the defendant Wheeler, which mortgage is a third mortgage on lot *B*, a first mortgage on *C*, and a second mortgage on lots *D* and *E*.

On the 29th day of March, 1883, Mrs. Hinman sold and conveyed the equity of redemption in all the lots, and also in several other lots mortgaged to Bull, to Harriet L. Benham.   June 19th, 1883, Mrs. Benham sold lots *D* and *E* to one Rausch, the consideration of which was used to pay the mortgages to the two savings banks, and to pay Wheeler $900 on his mortgage.   Wheeler thereupon released his mortgage on lots *D* and *E ;* the Middletown Savings Bank released its mortgage on lot *D ;* and the Naugatuck Savings Bank released its mortgage on lots *B* and *E ;* and the several release deeds were put on record.   The Bull mortgage also covered lot *B*, which was also subject to the Naugatuck Savings Bank mortgage, and also to a prior mortgage to one Bishop, which mortgage was foreclosed, neither the savings bank nor Bull redeeming, the title becoming absolute

March 6th, 1883. The lots *A* and *B* were described in the Bull mortgage as one lot and constitute the second piece therein described. That mortgage also embraces several other pieces of land in other parts of New Haven. The first piece is called the Elm street property, and was subject' to a prior mortgage to the Union Savings Bank of Danbury. That mortgage was foreclosed at the October term of the Superior Court, 1885, and it is found that the value of the property foreclosed exceeded the amount of the debt and charges by some $1,800. The fourth and fifth lots mortgaged to Bull were released by Bull in his lifetime and the eighth was released by his administrators after his decease. It is found that the total value of the equities of redemption in the lots so released was $1,000, over and above the prior mortgages.

On the 4th of February, 1886, the plaintiff became the owner of the Bull mortgage and the debt thereby secured.

· On the trial in the court below the defendant Wheeler claimed—1. That he was the owner of the Naugatuck Savings Bank mortgage, and that it is still outstanding in his hands upon lot *B*. 2. That it did not merge in the hands of Harriet L. Benham, so far as it covers lot *B*. 3. That it was still a lien on lot *B* as against the plaintiff to an amount proportionate to the whole amount of the mortgage debt, as the value of lot *B* is to the value of the whole security originally included in the mortgage. 4. That the plaintiff's mortgage debt should be reduced by the amount of the value of the equities of which he had been foreclosed and which had been released. 5. That it should be so reduced especially by the amount of the value of the equity in the Elm street property.

The court overruled these several claims and rendered judgment for the plaintiff. The defendants, Wheeler and Hinman, appealed. The reasons of appeal assigned are as follows :

1. The court erred in holding that Wheeler was not the owner of the Naugatuck Savings Bank mortgage, and that it was not still outstanding in his hands upon lot *B*.

2. The court erred in holding that the Naugatuck Savings Bank mortgage merged in the hands of said Harriet L. Benham so far as it covered lot *B*.

3. The court erred in holding that the Naugatuck Savings Bank mortgage was not still a lien on lot *B* in the hands of the defendant Wheeler as against the plaintiff, to an amount proportionate to the whole amount of the mortgage debt, as the value of lot *B* is to the value of the whole security originally included in the mortgage.

4. The court erred in holding that the plaintiff's mortgage debt should not be reduced by the amount of the value of the equities in the lots which had been foreclosed and which had been released.

5. The court erred in holding that the plaintiff's mortgage debt should not be so reduced by the amount of the value of the equity in the Elm street property.

The first three reasons of appeal may be considered together. They are in effect but one, and that is, that the Naugatuck Savings Bank mortgage is a subsisting incumbrance on lot *B* in favor of the defendant Wheeler. This claim assumes that the mortgage was not *paid* but *purchased* by Mrs. Benham; and that she, by her quit-claim deed of lots *B* and *C*, or by her conveyance of January 11th, 1887, transferred the mortgage to Wheeler.

Suppose that he is right in this claim; how does it benefit him? His interest in the premises is subject to that of the plaintiff. As between them Wheeler is primarily liable to pay the first mortgage. In a suit to foreclose that, his right to redeem would be first extinguished. Should he redeem as between himself and the plaintiff it will be deemed a payment; although as to subsequent incumbrances and the owner of the equity of redemption it will be regarded as a purchase. A second mortgagee may redeem the first mortgage and hold it against parties subsequent in interest; but subsequent parties cannot, except under peculiar or unusual circumstances, (which circumstances do not exist in this case,) redeem a first mortgage and hold it against a second mortgagee. Equity will regard it as a payment. It follows

that Lewis might redeem the first mortgage and hold it against Wheeler; but Wheeler, so long as he sustains the relation of a subsequent incumbrancer, cannot purchase it and hold it against Lewis. If then Wheeler is now the owner of that mortgage by purchase, by gift or otherwise, the result is the same; it is a payment so far as Lewis is concerned.

The existence of the first mortgage, in whosesoever hands it may be, can be no defense to this suit. The savings bank, or any stranger who may have purchased the mortgage, may compel Lewis to redeem; but neither the owner of the equity of redemption nor any subsequent mortgagee can do so.

Again. If Lewis had paid the first mortgage, either voluntarily or by compulsion, the amount so paid would be added to his demand, and Wheeler would be compelled to reimburse him before he could avail himself of his security. And that would be so if by any possibility he should be compelled to pay the first mortgage to Wheeler. If the defendant's claim is allowed therefore, the practical result is this: in the same suit the plaintiff is required to redeem the first mortgage by paying the amount of it to the defendant, and the defendant, in turn, is required to pay the same amount to the plaintiff. The law tolerates, much less requires, no such absurdity.

But the defendant is not right in his assumption. The mortgage to the savings bank cannot be regarded as subsisting to any extent or for any purpose as against this plaintiff. When Mrs. Benham caused the debt to be paid to the bank, she received from that institution and put on record a quit-claim deed containing this clause: "Being the same premises mortgaged to said savings bank on the 14th day of August, 1879, by Marcia M. Hinman, to secure payment of a note of $1,600, *which is now paid in full, and the object of this deed is to release the security therefor.*" The grantee was then the owner of the equity of redemption. As such it was her duty, so far as intervening incumbrances were concerned, to pay this mortgage. She did pay it on

the 19th day of June, 1883, accepted a deed containing this significant declaration, and on the 7th day of July following caused that deed to be put on record. She then and thereby proclaimed to all the world that that mortgage was paid, not purchased, and the security therefor discharged and not transferred. On the 4th day of February, 1886, the plaintiff purchased the Bull note and mortgage, relying upon that declaration as true. As against him Mrs. Benham, and all persons claiming under her, are effectually precluded from claiming to the contrary.

For the purposes of this case the first mortgage debt is paid and the security therefor discharged. Consequently the defendant cannot avail himself of that mortgage for any purpose.

If necessary it would not be difficult to show from the record that the defendants did not purchase and did not at the time intend to hold this mortgage against the plaintiff. The deed from the savings bank, to which we have referred, is potent if not conclusive evidence that Mrs. Benham then intended a merger. She clearly intended payment, and therefore a merger, so far as lots $D$ and $E$ are concerned, for the object of the transaction was to clear those lots so that she could give Rausch a clear title; and it is almost as certain that she did not intend to hold the mortgage against $B$ and $C$, for she immediately gave a quit-claim deed thereof to Wheeler; and there is no evidence that he paid her anything for it, and the finding is clear that he furnished no portion of the funds with which the debt was paid. Intending a merger as to a part of the property raises a presumption that it was intended as to all; and that presumption must prevail unless there is something in the case which rebuts the presumption, or shows the existence of a contrary intent. We may add to this the significant fact that Mrs. Benham, after she had paid the debt to the bank, surrendered the note to the maker, Mrs. Hinman. Thus the record seems to afford overwhelming evidence that she did not in fact intend to preserve the mortgage in force.

If it be objected that we have been considering matters of

fact, our reply is, that this is the defendants' appeal. They fail to show us affirmatively and in terms that they intended at the time to keep the mortgage alive. But they do ask us to say from the record as it stands that the mortgage still exists. We have examined the record and have come, as the court below did, to a contrary conclusion.

We are asked to distinguish lot *B* from the other property described in the bank mortgage, for the reason that the defendants did not in fact know that that lot was embraced in the plaintiff's mortgage. The finding is that Wheeler had no actual knowledge that the Bull mortgage covered lot *B*, and he supposed it did not until March 17th, 1885. But for this supposition he would not have released his interest in lots *D* and *E* to Mrs. Benham, and would not have accepted from her the release deed of her interest in lots *B* and *C*. It is also found that it did not appear that Mrs. Benham had any knowledge of the Bull mortgage save what she obtained from the record.

On that ground it is claimed that the actual intention to pay the debt and have the mortgage discharged should be disregarded, and, on the assumption that it was for Mrs. Benham's interest to have the mortgage transferred and that it would have been had they known the facts, that the mortgage should now be regarded as still in force.

To this claim there are two objections. In the first place, for reasons already suggested, we are unable to see how Mrs. Benham could purchase the mortgage and thereby defeat or impair a subsequent mortgage. But it is not Mrs. Benham that is now attempting to make use of it. It is a third mortgagee, who has received whatever right he has in the first mortgage as a gratuity, who is attempting to use it to the prejudice of the second mortgagee. There is nothing in Mrs. Benham's position that calls for such an unusual interposition of the court. Her rights are not in peril; no one is attempting inequitably to take anything from her. On the other hand it is just and equitable that the plaintiff should have the full benefit of his security.

Neither can we discover that Wheeler's equities are supe-

rior to the plaintiff's. He stands precisely where he placed himself. The plaintiff has done nothing to his prejudice. If through his ignorance of certain facts he is in a worse condition than he otherwise would have been, the plaintiff is in no wise responsible for it, and there is no reason for transferring the consequences thereof to him, unless he thereby obtains some undue advantage. If it is true, as we suppose it is, that nothing that Mrs. Benham or Wheeler could have done in respect to the first mortgage could impair the plaintiff's security, then there can be no reason for the interference of the court in the manner proposed.

In the second place, Mrs. Benham can hardly be said, in a legal sense, to have been ignorant of the facts. She had constructive notice of the plaintiff's mortgage, unless such notice is defeated by the mistake of the clerk in recording it. The consequences of that mistake should not be visited upon the mortgagee. He did all he could do and all that the law required of him. He left his deed for record, and the record, by the statute, is to be as of that date. From that time, which necessarily antedates the actual recording, his title is secure. He cannot be prejudiced by any subsequent action without his fault. But if this is stating it more strongly than the case requires, we would call attention to the actual facts of the case. The mistake consists in giving the westerly line of lots $A$ and $B$, described as one piece, as thirty-five feet on Cedar street, instead of sixty-five feet as it is in the original. The other three lines are correctly recorded and the length of each is given. The piece is rectangular, being one hundred and six feet long by sixty-five feet in width. Lot $A$ is forty feet wide and lot $B$ is twenty-five feet wide on Cedar street. The record gives that line as thirty-five feet, but that line is not defined or located. If we locate it at the northerly end of the boundary on Cedar street, then it does not extend the whole width of lot $A$; consequently does not reach lot $B$; but the description requires the southerly line of the piece to run from the southerly end of the thirty-five feet, diagonally through lot $B$, to the southeast corner of the whole lot.

That embraces within the description nearly half of lot *B*. The record as it stands therefore is constructive notice to that extent of the mortgage on that lot. But we think it is more than that. To those familiar with the premises, and interested in knowing the extent of the incumbrances thereon, as Mrs. Benham must be presumed to have been, the record could hardly fail to suggest a mistake; and that would have put her upon inquiry, and charges her with full notice of what the deed contains.

As to Wheeler. Although his mortgage antedates the plaintiff's, yet the record thereof bears a subsequent date. Mrs. Hinman's mortgage to him was made on the 3d day of August, 1882, but was not put on record till October 17th. In the meantime the mortgage to Bull had been made on the 29th of August and put on record on the 1st of September. We are not aware that the point thus raised has been directly decided, but we are inclined to think that he is legally chargeable with notice of all that the record contained at the time he left his own deed to be recorded. But we do not rely on this point; for it is conceded that whatever interest he has in the first mortgage he derived from Mrs. Benham. If he is a mere volunteer clearly the plaintiff's equities are superior to his. If not, then he is chargeable with constructive notice to the same extent, and for the same reasons, that Mrs. Benham is; for he took his deeds from her with knowledge of all that the record contains.

The fourth error assigned is, that the court refused to reduce the plaintiff's debt by the amount of the value of the equities in the lots released and foreclosed.

Bull in his lifetime released to Mrs. Benham the mortgage on the fourth and fifth lots described in the mortgage, and after his death his administrators released the mortgage on the eighth lot. These equities were of the value of $1,000 over and above the prior mortgages then outstanding. When the releases were given neither Bull nor his administrators had actual knowledge of Wheeler's mortgage. They did not have constructive knowledge, because Wheeler's mortgage was recorded subsequently to Bull's. *Rowan* v.

Lewis *v.* Hinman.

*Sharp's Rifle Mfg. Co.*, 29 Conn., 282; 1 Jones on Mortgages, § 723; *McIlvain* v. *Mutual Assurance Co.*, 93 Penn. St., 30. In order to charge the plaintiff with the value of these equities it is essential that Bull and his administrators, when executing the releases respectively, should have had knowledge of Wheeler's mortgage. This is conceded in the defendants' brief. The sixth and seventh tracts, and a part of the second tract, described in the plaintiff's mortgage, were foreclosed by the prior mortgagees. The equity of redemption in these tracts was of no value.

The first tract, known as the Elm street property, was subject to a prior mortgage for $5,000 to the Union Savings Bank of Danbury. On March 17th, 1885, Wheeler, after informing Lewis of his mortgage, requested the latter to take the equity of redemption in the first piece, or to redeem the savings bank mortgage. Subsequently the mortgage was foreclosed, none of the defendants redeeming. This tract was then worth nearly $2,000 over and above the prior mortgage. That excess, it is now claimed, is chargeable to the plaintiff.

The amount due the savings bank then amounted to over $6,000, a large sum in proportion to the plaintiff's debt. It was hardly reasonable to require Lewis to raise so large a sum and take property for that as well as his own claim. As the debt covered over three quarters of the estimated value of the property there was some risk and inconvenience attending the transaction. That risk and inconvenience Wheeler could not require Lewis to assume; especially as he had a right to redeem the plaintiff's mortgage, when he would have been subrogated to the plaintiff's rights, and could himself have redeemed the bank mortgage and saved the equity. As between the two that duty seems to have devolved upon Wheeler rather than Lewis.

We find no error in the judgment complained of.

In this opinion the other judges concurred.